UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

COUSIN SUBS SYSTEMS INC.,

        Plaintiff,

        v.                                   Case No. 09-C-0336

BETTER SUBS DEVELOPMENT INC.,
BETTER SUBS RESTAURANT LLC,
JAMES B.  RAILING,
KAREN E.  RAILING,
SHANTEL E.  VAUGHN,

                Defendants and
                Counterclaim Plaintiffs,

        v.

WILLIAM F. SPECHT,
ESTATE OF JAMES F. SHEPPARD,
DONALD A. MORELLO, and
MORELLO FRANCHISE DEVELOPMENT CO., INC.

                Counterclaim Defendants.

DECISION AND ORDER DENYING PLAINTIFF COUSIN SUBS SYSTEMS, INC.'S
MOTION FOR SUMMARY JUDGMENT ON THE COMPLAINT (DOC. 56),
GRANTING IN PART AND DENYING IN PART PLAINTIFF AND COUNTERCLAIM
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON DEFENDANTS'
COUNTERCLAIMS (DOC. 59),  GRANTING PLAINTIFF AND COUNTERCLAIM
DEFENDANTS' MOTION TO STRIKE DEFENDANTS' JURY DEMAND (DOC. 61),
AND SETTING TELEPHONIC STATUS CONFERENCE

      Cousins Subs, Inc. sued defendants for breach of various contracts related to the

failure of the defendants to appropriately develop Cousins Subs franchises in Indiana.

Defendants counterclaimed, joining former and current representatives of Cousins, alleging

that Cousins and its representatives induced defendants to sign the contracts with

fraudulent representations regarding personnel and profit forecasts.[1]  The estate of James

Sheppard was dismissed from the counterclaims by a stipulation (Doc. 53) and order dated

August 26, 2010.  Plaintiffs move for summary judgment and dismissal of the complaint,

the counterclaims, as well as an order striking defendants' jury demand.  Because the

three motions are intertwined with similar legal arguments and facts, the court decides

them together.

This dispute involves three contracts that appear to waive the grounds for

defendants' counterclaims.  However, there is conflicting evidence of what was said

between Cousins' area developer Donald Moreno and defendant James Railing, such as

whether Moreno intentionally gave Railing false data knowing that Railing would rely on the

data to develop profit forecasts for the proposed franchises.

Notwithstanding the wide discrepancy between the parties' version of the facts,

plaintiffs maintain that they are entitled to summary judgment.  Plaintiffs' motion for

summary judgment and dismissal of the complaint must be denied, as well as the motion

for summary judgment and dismissal of the counterclaims involving intentional fraud.  As

to the remaining counterclaims, plaintiffs' motion for summary judgment will be granted.

Plaintiffs' motion to strike defendants' jury demand will be granted as well.

FINDINGS OF FACT

This once promising relationship gone terribly wrong has a wide and sometimes

confusing array of parties.  Cousins Subs, Inc., a Wisconsin corporation with its principal

---

[1]For purposes of resolving the pending motions, any reference to plaintiffs includes
Cousins Subs, Inc., William Sprecht, Donald Morello, and Morello Franchise Development Co., Inc., all of
whom are current or former representatives of Cousins, or operate Cousins franchises.  Defendants
include Railing and his family, who tried to establish the franchises in Indiana.

place of business in Menomonee Falls, WI, is a restaurant franchise that sells submarine sandwiches. (Resp. to Pl. SOF ¶ 5.) William Specht was the Chief Executive Officer of Cousins at all relevant times. (James B. Railing Decl. ¶ 118.)

Donald Morello played various roles. First, he was a Cousins' franchise owner of several restaurants in the Madison, WI area. (James B. Railing Decl. ¶ 14.) He was also the President of Dane County Franchise Development Co (James B. Railing Decl. ¶ 19) and the owner of Morello Franchise Development Co., Inc. (James B. Railing Decl. ¶ 154.)[2] Morello acted as a franchise broker for Cousins, and performed consulting services for Cousins. (Pl. PFOF ¶ 25.) Finally, he was a Selling Agent for Cousins, through which he received fees and commissions from Cousins. (James B. Railing Decl. ¶ 28.)

Finally, Morello Franchise Development Co., Inc. is an area development company in southern Wisconsin, including the area around Madison, WI. (James B. Railing Decl. ¶ 154.) The company owns several Cousins restaurants, and its representatives have consulted for Cousins. (James B. Railing Decl. ¶ 154; Pl. PFOF ¶ 25.)

On the side of defendants, James Railing was a citizen and resident of Indiana, as well as a former practicing attorney. (James Railing Decl. ¶¶ 3, 6.) Independent of his law practice, he worked with financial matters related to existing franchises. (James B. Railing Decl. ¶¶ 6, 8-11.) Among the several defendants, Railing had the most interaction with the plaintiffs, as described below.

---

[2]The court is not clear if these are separate companies, or are the same company referred to in different ways.

Railing's wife, Karen Railing, and daughter in law, Shantel Vaughn, were citizens and residents of the State of Indiana. (Def. PFOF ¶¶ 4, 5.) Both women had limited contact with plaintiffs.

Railing, his wife, and daughter in law contributed to create Better Subs Development, Inc. ("BSD") and Better Subs Restaurants, LLC ("BSR") under Indiana law. (Def. PFOF ¶¶ 1, 2.) BSD's principal place of business is in Indiana, and Railing is the president and sole shareholder of BSD. (Def. PFOF ¶¶ 1, 3.) Railing, his wife, and daughter in law are all members of BSR. (Def. PFOF ¶¶ 3-5.)

The saga begins in earnest on August 23, 2006. (James B. Railing Decl. ¶ 12.) That day, Railing, his wife and daughter in law all attended a Cousins Discovery Day to learn more about becoming Cousins franchisees. (James B. Railing Decl. ¶ 12.) They were taken on a tour of eight regional Cousins Subs stores by Patrick McCabe, who was the Real Estate Manager for Cousins Subs. (James B. Railing Decl. ¶ 14.) Conversations took place, and Cousins was generally introduced, but these conversations contain disputed statements.

Between this first day and the signing of the contracts, there were numerous phone conversations between Railing and various representatives of Cousins. Additionally, Railing reviewed significant amounts of information regarding Cousins stores, potential sites, and other matters necessary to start a restaurant. These issues are hotly debated, and will be discussed below.

In less dispute is the paperwork that passed between the parties. In addition to his phone conversations, Railing had several email exchanges. (*See*, *e.g.*, Def. PFOF ¶ 15.) Also, Cousins representatives sent several documents to the defendants, some of which

4

required defendants to respond with information. The first important document received was the Uniform Franchise Offering Circular, which stated in relevant part that "Cousins does not furnish or authorize its salespersons to furnish any oral or written information concerning the actual or potential, sale, costs, income, or profits of a Cousins Sub Shop. Actual results vary from unit to unit, and Cousins cannot estimate the results of any particular franchise." (Pl. PFOF ¶ 18.) Additionally, the UFOC indicated that "[T]he Franchise Agreement and the Area Development Agreement contain a number of provisions that may affect your legal rights, including a waiver of a right to jury trial, ... Cousins recommends that you carefully review all of these provisions, and the entire contracts, with a lawyer." (Pl. Jury Demand Br. at 3.)

Next, defendants received and executed the franchise disclosure questionnaire. Railing, his wife, and daughter in law received and executed their separate questionnaires. (Pl. PFOF ¶ 19.) Each person stated that they "discussed the benefits and risks of operating a Cousins Subs shop with an attorney, accountant, or other professional advisor" and they understood "the risks of operating a Cousins Sub Shop." (Pl. PFOF ¶ 20.) They admitted that no representative of Cousins "made any statement or promise concerning the total amount of revenue the Cousins Subs will generate" and that no representative of Cousins "made any statement of the likelihood of success that you might expect to achieve from operating a Cousins Subs." (Pl. PFOF ¶ 22.)

The third document received prior to the execution of the contracts was an updated September 5, 2006, UFOC. (Pl. PFOF ¶ 24.) This UFOC identified Morello and Morello Franchise Development Co. as Franchise brokers for Cousins, and stated that Morello Franchise Development Co. engaged in franchise development services for Cousins. (Pl.

5

PFOF ¶ 25.)  Railing reviewed this document prior to executing the contracts.  (Pl. PFOF ¶ 26.)

But Railing was considering more than opening a few franchises.  He was also considering the creation of an area development company that would establish multiple stores.  Accordingly, Railing executed an Area Developer Questionnaire.  (Pl. PFOF ¶ 59.)  This questionnaire provides in pertinent part that no representative of Cousins "made any statement or promise concerning the revenues, profits or operating costs of a Cousins subs Shop Operated by Cousins Subs Systems, Inc. or its franchisees," and that no representative of Cousins "made any statement or promise regarding the amount of money you may earn in developing and/or operating Cousins Subs." (Pl. PFOF ¶ 61.)

After this research period, Cousins and defendants entered three contracts.  First, they executed a franchise agreement for a restaurant in Columbus, Indiana ("Columbus Agreement").  Second, they executed a franchise agreement for a restaurant in Scottsburg, Indiana ("Scottburg Agreement").  Third, Cousins and BSD executed an Area Development Agreement ("ADA").

On September 20, 2006, BSR and Cousins executed the Columbus Agreement.  (Pl. PFOF ¶ 27.) Moreover, Railing, his wife and daughter in law executed a personal guaranty. (Pl. PFOF ¶ 30.)  The franchise agreement provides in relevant part:

> FRANCHISEE acknowledges that it has not received, any warranty or guaranty, express or implied, as to the potential volume, profits, or success of the business venture contemplated by this Agreement[.]  FRANCHISEE acknowledges that it has read this Agreement and the FRANCHISOR'S Uniform Franchise Offering Circular and that it has no knowledge of any representation by the FRANCHISOR, or its officers, directors, shareholders, employees, or agents that are contrary to the statements made

6

in the FRANCHISOR'S Uniform Franchise Offering Circular or the terms herein."[3]

(Pl. PFOF ¶ 40.)  Additionally, the Columbus Agreement indicated that "**FRANCHISOR AND FRANCHISEE IRREVOCABLY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, BROUGHT BY EITHER OF THEM.**"  (Pl. Jury Demand at 3) (emphasis retained).  The Columbus Agreement also contained terms requiring defendants to pay various fees based upon gross receipts rather than net profit.  (Pl. PFOF ¶¶ 38-39.)

The Columbus restaurant opened in December 2006.  (Pl. PFOF ¶ 48.)  However, the Columbus restaurant achieved only $200,000 annualized actual sales revenue.  (Def. PFOF ¶ 167.)  To remain profitable, it needed to earn $382,500.  (Def. PFOF ¶ 185.)  In February 2008, defendants attempted a remodeling of the restaurant but the restaurant closed by October of 2008.  (Pl. PFOF ¶ 52.)

On November 25, 2007, BSR and Cousins executed the Scottsburg Agreement. (Pl. PFOF ¶ 53.)  The pertinent provisions and the personal guaranties mirror those for the Columbus Agreement.  (Pl. PFOF ¶¶ 54-55.)  The Scottsburg restaurant opened in March of 2008.  (Def. PFOF ¶ 171.)  While the parties are not as clear with respect to financial figures, the court interprets the filings to indicate that the Scottsburg restaurant provided similar earnings that were significantly below the breakeven marker of $382,500.  The Scottsburg restaurant closed in September 2008.  (Pl. PFOF ¶ 57.)

---

[3]As stated above, the court believes that the Uniform Franchise Offering Circular refers to the two UFOCs described above.

7

On November 14, 2006, BSD and Cousins executed the ADA. (Pl. PFOF ¶ 63.) Railing also executed a personal guaranty. (Pl. PFOF ¶ 64.) The ADA provides in relevant part that BSD would develop twenty restaurants that would open according to a schedule over a ten year period. (Pl. PFOF ¶¶ 67-69.) If the parties did not comply with the schedule, Cousins could terminate. (Pl. PFOF ¶ 71.) Additionally, the ADA stated "there are no other oral or written understandings or agreements between FRANCHISOR and AREA DEVELOPER relating to the subject matter of this Agreement." Finally, the ADA indicated that "**FRANCHISOR AND AREA DEVELOPER IRREVOCABLY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, BROUGHT BY EITHER OF THEM**." (Pl. Jury Demand at 3) (emphasis retained).

Following the closure of the Scottsburg restaurant, no further restaurants were opened. BSD did not comply with the schedules per the ADA. (Pl. PFOF ¶ 74.) Additionally, a $40,000 executed promissory note connected to the ADA has not been paid. (Pl. PFOF ¶ 75.)

CONCLUSIONS OF LAW

As indicated above, this decision discusses three motions. First, the court will analyze the two motions for summary judgment inasmuch as they involve similar arguments from the defendants in their answers and counterclaims. Second, the court will analyze the motion to strike the jury demand with reference to arguments made in the summary judgment analysis. It is noted that the case involves the laws of Wisconsin and Indiana. The parties have not addressed choice of law and the documents at issue provide

8

that Wisconsin law governs, but, as the parties suggest, the choice between Wisconsin and Indiana law does not appear to affect this decision.

A.      Summary Judgment Standard

Summary judgment is appropriate if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In deciding a motion for summary judgment, the court must view all facts and draw all inferences from those facts in the light most favorable to the non-moving party. *Schuster v. Lucent Technologies, Inc.*, 327 F.3d 569, 573 (7th Cir. 2003). However, the non-moving party may not simply rest on its allegations; rather, it must come forward with specific facts that would support a jury's verdict in its favor. *Van Diest Supply Co. v. Shelby County State Bank*, 425 F.3d 437, 439 (7th Cir. 2005). The non-moving party must show that the disputed fact is material, or outcome-determinative, under applicable law. *Local 1545, United Mine Workers v. Inland Steel Coal Co.*, 876 F.2d 1288, 1293 (7th Cir. 1989). However, credibility determinations "are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).

In its complaint, Cousins claims that: (1) defendants breached the Columbus Agreement; (2) defendants breached the Scottsburg Agreement; (3) defendants breached the Area Devevelopment Agreement; (4) defendants breached the promissory note; (5) defendants breached their guaranties of the franchise agreements; and (6) that Railing breached his guaranty of the Area Development Agreement. Defendants maintain that the contracts are void. In their combined affirmative defenses and counterclaims, defendants argue that plaintiffs jointly and severally provided fraudulent data, made fraudulent

9

promises, and hid material facts that induced defendants to sign the contracts, rendering the contracts void. They counterclaim for: (1) intentional misrepresentation; (2) strict liability misrepresentation; (3) negligent misrepresentation; (4) breach of all the contracts for a failure to provide assistance; (5) violations of the Wisconsin Deceptive Trade Practices Act; (6) violations of the Wisconsin and Indiana statutes governing franchises; (7) violations of Wisconsin and Indiana theft statutes; and (8) recission.

Plaintiffs respond that the economic loss doctrine, no-reliance clauses in the contracts and other paperwork, and parol evidence rule bars these claims, and that defendants have failed to show representations that were not opinions or puffery.

B.    Economic Loss Doctrine

The economic loss doctrine is a judicially created rule that "preclude[es] contracting parties from pursuing tort recovery for purely economic or commercial losses associated with the contract relationship." *Kaloti Enters., Inc. v. Kellogg Sales Co.*, 2005 WI 111, ¶ 27, 283 Wis.2d 555, 699 N.W.2d 205 (quotations omitted). "Economic loss" is defined as "damages resulting from inadequate value because the product is inferior and does not work for the general purposes for which it was manufactured and sold." *Id.* at ¶ 29.

Although the economic loss doctrine precludes recovery for many fraud claims that cause purely economic damages, it applies to goods and not services. *Ins. Co. of N. Am. v. Cease Elec. Inc.*, 2004 WI 139, ¶ 53, 276 Wis. 2d 361, 688 N.W.2d 462. Courts consider the totality of the circumstances when determining whether a contract predominantly involves a good or service. *1325 N. Van Buren, LLC v. T-3 Group, Ltd.*, 2006 WI 94, ¶ 42, 293 Wis. 2d 410, 435, 716 N.W.2d 822. At issue here are whether the two Cousins Subs Systems, Inc., Franchise Agreements and the Area Development

Agreement between Cousins Subs Systems and Better Subs Restaurants predominantly provide a good or a service.

Plaintiffs argue that the agreements are "predominantly licenses for the right to distribute Cousins' products," citing *CERAbio LLC v. Wright Med. Tech*, 410 F. 3d 981 (7th Cir. 2005), and "numerous courts" recognizing that franchises involve exchanges of goods. *See, e.g., Heating & Air Specialists, Inc. v. Lennox Indus., Inc.*, 180 F. 3d 923, 932 (1st Cir. 1999); *TWB Distrib., LLC v. BBL, Inc.*, 2009 WL 5103604 (W.D. Ky. 2009). However, reliance on *CERAbio* is misplaced for two reasons. First, *CERAbio* did not involve a franchise relationship or an area development agreement, but rather the sale of all assets of a business. *Id.* at 984. That "technological knowledge," including patents, was transferred did not alter the fundamental nature of the contract because the sale included all of the assets. Further, the transferee company in *Cerabio* sued for fraud when it discovered that a chemical ingredient required to produce the transferor's bone replacement product was no longer available, rendering the technology useless. In addition, the two cases cited by plaintiffs to demonstrate that "courts all over" find that franchises involve the sale of goods addressed a franchise that sells heating and air conditioning products and a distribution agreement for the sale of "ReVive" brand skin care products. Selling a restaurant franchise is not the same as selling all of the assets of a business or even the sale of air conditioner products or cosmetics. While some franchises involve the sale of goods, that is not true of them all.

The twenty-eight page Area Development Agreement confers the "right and obligation to develop a number of COUSINS SUBS Shops utilizing the Marks and the System within the Exclusive Area ...." The area developer solicits franchises and assists

11

the franchisor "in rendering certain services to certain Franchisees within the Exclusive Area." The Franchise Agreements refer to the method of preparing food, the use of certain marks, the specifications for equipment, fixtures, and signs, training and assistance, operating systems, and uniform standards. While plaintiffs may provide some goods to the franchisee, the primary focus of the agreements is the granting of a franchise and the corollary systems, standards, and marks. These services provide the appropriate look and atmosphere of a restaurant, and the franchisee, in turn, provides a place to sit and eat. Indeed, the dispute between the parties has nothing to do with the characteristics of the food or any goods, but rather the services contemplated by the agreement.

It should further be noted that the economic loss doctrine requires parties to pursue contractual remedies. *See Harley-Davidson Motor Co. v. Power Sports, Inc.,* 319 F.3d 973, 981 (7th Cir. 2003). In this case the defendants seeks damages and the recission of the franchise agreements. Accordingly, the court holds that Wisconsin's economic loss doctrine is not applicable here.

C. Fraud Claims

As mentioned above, defendants assert fraud claims and defenses, including negligent fraud, strict liability fraud, and intentional fraud. The court will first analyze whether the basic fraud claims of negligent fraud and strict liability fraud can be maintained against the no-reliance clauses as a matter of law. Next, the court will consider whether the no-reliance clauses are a defense to intentional fraud as a matter of law. If a claim can be brought as a matter of law, the court can consider whether there are facts sufficient to support it.

1.    Basic Fraud, No-Reliance Clauses, and Integration Clauses

12

In Wisconsin, fraud has three elements: (1) the defendant must have made a representation of fact to the plaintiffs; (2) the representation of fact must be false; and (3) the plaintiffs must have believed and relied on the misrepresentation to his detriment or damage. *Tietsworth v. Harley Davidson,* 270 Wis.2d 146, 677 N.W.2d 233**,** 239 (2004). Statements of fact must relate to a present issue of fact, not something to occur in the future. *Hartwig v. Bitter*, 29 Wis.2d 653, 657, 139 N.W.2d 644 (1966). Additionally, no-reliance clauses are enforceable, *Extra Equipamentos E Exportacao LTDA v. Case Corp.*, 541 F.3d 719, 724 (7th Cir. 2008), and integration clauses work to exclude oral communications from the written contract. *See Wright-Moore Corp. v. Ricoh Corp.*, 908 F.2d 128, 141 (7th Cir. 1990).[4]

The claims for basic fraud include strict liability misrepresentation and negligent misrepresentation.[5] These cannot be maintained against the no-reliance and integration clauses of the contracts. Intent is irrelevant to this analysis and the clear contractual clauses bar defendants from relying on any information not contained in the contract. As a matter of law, no-reliance clauses are enforceable, and defendants signed such a clause. Hence, as a matter of law, defendants basic fraud claims cannot defend against plaintiffs' claims.

---

[4]In effect, the parol evidence rule accomplishes the same as the integration clause. While plaintiffs pile-on their arguments by mentioning the parol evidence rule without further explanation, the court understands that it is analyzing that argument along with the integration clause.

[5]Defendants have not contended plaintiffs' assertion that Indiana does not recognize strict liability or negligent misrepresentation. (Pl. Br. at n. 4.)

13

The facts vividly illustrate this logic. At issue is whether providing incorrect financial data to Railing is actionable.[6] Railing, an attorney, was provided two UFOCs, two questionnaires, and three contracts, all of which contained express provisions denying his ability to rely on representations of financial data and other purported promises. To the extent that a representative of Cousins made a false representation of fact, Railing could not rely on those statements by the express and very clear terms of these documents. Ultimately, whether by the no-reliance clauses, the integration clauses, or the parol evidence rule, defendants cannot maintain these fraud claims challenging solely whether there was a false representation of fact. The strict liability fraud and the negligent fraud counterclaims must be dismissed.

> 2.      Intentional Fraud, No-Reliance Clauses, and Integration Clauses

The analysis changes when intent is involved. In addition to the fraud elements above, Wisconsin adds the following: (4) the representations must have made with the knowledge that it was false or recklessly without caring whether it was true or false; and (5) the representation must have made with the intent to deceive and to induce defendants to act on it to their detriment or damage. *Tietsworth,* 270 Wis. 2d at 157. Most importantly, though, exculpatory clauses are not enforceable when the fraud is carried out

---

[6]These are the only misrepresentations existing at the time the statements were made; future promises and guarantees are not candidates as misrepresentations because they were not false at the time they were made. For example, Railing contends that Morello made promises about the future profits Cousins franchises could expect, that Cousins employee Patrick McCabe made promises about the average income of Cousins franchises visited on Discovery Day (Def. PFOF ¶ 104), that Morello reviewed and approved as accurate for use in future predictions of success numbers produced by Railing (e.g., Def. PFOF ¶¶ 119-146), that Morello told Railing he could expect around $390-465,000 in sales revenue (Def. PFOF ¶¶ 143-146), and other predictions of future financial data. These were not false at the time the representation was made.

14

intentionally or recklessly.[7]   *Merten v. Nathan*, 108 Wis. 2d 205, 212, 321 N.W. 2d 173 (1982).[8]

It is axiomatic that the no-reliance clauses and integration clauses are rejected in this analysis as a matter of law pursuant to *Merten*.  Viewing the remaining facts in the light most favorable to the defendants, there is a genuine issue of material fact whether representatives of Cousins intentionally misrepresented material facts to the defendants. Numerous times, defendants recount instances where Cousins representatives provided false financial data.  As one example,  Morello provided financial data to Railing about a Cousins restaurant in Fitchburg, Wisconsin. (James B. Railing Decl. ¶ 39.)  In an email that defendants have provided as an exhibit, Morello advised   Railing that Fitchburg grossed between $314,500 to over $421,000.   (James B. Railing Decl. ¶ 39.)   In discovery, defendants received financial data from the only Cousins restaurant in Fitchburg. (James B. Railing Decl. ¶ 155.)  In 2005, Fitchburg grossed $289,145.  (James B. Railing Decl. ¶ 167.)  In 2006, Fitchburg grossed $269,745.  (James B. Railing Decl. ¶ 167.)

Morello was a sales agent of Cousins who received commissions.  Even if he did not know the actual sales data of this location outside his territory, his alleged representations were made on behalf of Cousins through his role as a paid agent and

---

[7]As Judge Hand wrote, "... the ingenuity of draftsmen is sure to keep pace with the demands of wrongdoers, and if a deliberate fraud may be shielded by a clause in a contract that the writing contains every representation made by way of inducement, or that utterances shown to be true were not an inducement to the agreement, [a party could defraud others] through the simple expedient of placing such a clause ... in the contracts which their dupes are asked to sign." *Arnold v. National Aniline & Chemical Co.*, 20 F.2d 364, 369 (2d Cir.1927)

[8]Indiana fraud is similar to Wisconsin intentional fraud, requiring: (1) a material misrepresentation of past or existing fact which (2) was untrue, (3) was made with knowledge of or in reckless ignorance of its falsity, (4) was made with the intent to deceive, (5) was rightfully relied upon by the complaining party, and (6) which proximately caused the injury or damage complained of." *Lawyers Title Ins. Corp. v. Pokraka*, 595 N.E.2d 244, 249 (Ind. 1992).  No reliance clauses are not enforceable against fraud claims.  *Jenkins v. Nelson Properties, Inc.*, 439 N.E. 2d 686, 694 (Ind. Ct. App. 1982).

15

were, at a minimum, made recklessly.  In the light most favorable to the nonmoving party, Morello knew that Railing relied on these statements to develop financial forecasts because he communicated with Railing about those forecasts many times.  (*E.g.*, Def. PFOF ¶¶ 119-146.)  Indeed, he even represented numerous times that Railing predicted sales revenue of not less than $400,000.  (*E.g.*, James B. Railing Decl. ¶ 117.)  And, quite obviously, everyone involved knew that Railing was making these financial forecasts to open a Cousins restaurant.  When Railing signed the three contracts, Morello received a $5,000 commission.  (James B. Railing Decl. ¶ 147.)  Over-calculating expected revenue by nearly double of what was actually received – which was in line with many other Cousins restaurants – was a fatal error for defendants and their restaurants. Under this view of the facts most favorable to defendants, there is a genuine issue of material fact.[9]

According to Railing's version of the facts, Cousins has created a complex system of deceit designed to extract significant royalties even as franchise locations fail.  If true, this complexity cannot be defended by a well-drafted contract.  Ingenious wrongdoers cannot immunize their wrongdoing from the law with a single clause. Accordingly, the motion for summary judgment on the complaint must be denied because the intentional fraud claims are in defendants' answer.  Likewise, the motion for summary judgment against the counterclaims for intentional fraud must be denied.

### 3. Duty to Disclose  Morello as a representative of Cousins

The parties give significant effort to whether Morello presented himself as an agent of Cousins or an agent of Morello Franchise Development, Co.  Related is their debate

---

[9]Certainly, the court will entertain any evidentiary motions the parties believe are appropriate, particularly with respect to the discrepancy in the depositions of Railing and Morello.

16

about how much Railing had to vet the document, and whether he should have signed a document containing the no-reliance and integration clauses.  This discussion appears to derive from the parties belief that the above fraud discussion is an all or nothing gambit, and they have not properly separated intentional fraud from basic fraud.  In light of the above discussion on fraud, the court considers moot the issues of whether Cousins had a duty to disclose Morello as a sales agent, and whether Railing should have objected to the no-reliance and integrations clauses. The issue is the intent to provide specific false facts already in existence, and this issue is not informed by these two arguments; whether defendants knew or did not know  Morello was a sales agent has no impact on whether he, as an agent of Cousins, intentionally provided false facts to defendants.

D.      Breach of Contract

To succeed on a breach of contract claim, a party must show: (1) a valid contract; (2) breach of that contract; and (3) damages. *See Wior v. Anchor Indus.*, 669 N.E.2d 172, 175 (Ind. 1996); *Mgmt. Computer Servs. v. Hawkins, Ash, Baptie & Co.,* 557 N.W.2d 67, 75-78 (Wis. 1996); *Riegleman v. Krieg*, 679 N.W.2d 857, 862-63 (Wis. Ct. App. 2004). Defendants argue that plaintiffs breached their contract when they failed to provide assistance in site selection, and that Specht ratified the decision to remain at the Columbus site.  Defendants rely on a contract clause stating that Cousins, "use reasonable efforts to help analyze FRANCHISEE's market area, to help determine site feasibility, and to assist in the selection of the location, which must be approved by FRANCHISOR." (Pl. PFOF ¶ 37.)  They also rely on an expert who opined that the help provided by plaintiffs was below industry standards.  Plaintiffs contend that defendants admit they were solely responsible for site selection, that Cousins was not obligated to help with site selection until Railing had

17

made his decision, and that Cousins only promised reasonable assistance, not industry standard assistance.

At the heart of the clause in contention is "reasonable efforts." In the light most favorable to the nonmoving party, Cousins does not appear to have made any effort at all and instead relied solely upon Railing's previous review of the area. There are two obstacles to plaintiffs' motions: (1) whether or not it was reasonable to rely on a third-party's efforts is a matter for the jury; and, (2) as discussed above, viewing the facts in the light most favorable to the defendants, Railing's review was based on intentionally provided fraudulent facts. For either of these reasons, there is a genuine issue of material fact. Therefore, plaintiffs' motion must be denied with respect to defendants counterclaims for breach of contract.

E.     Violation of the Wisconsin Deceptive Trade Practices

Where the language of a statute is clear and unambiguous, Wisconsin courts apply the plain words of the statute and ordinarily proceed no further. *State ex rel. Kalal v. Circuit Court for Dane County,* 271 Wis.2d 633, 681 N.W.2d 110 (Wis. 2004). Wis. Stat. § 100.18 provides protections for the public against fraudulent representations contained in "in a newspaper, magazine or other publication, or in the form of a book, notice, handbill, poster, bill, circular, pamphlet, letter, sign, placard, card, label, or over any radio or television station, or in any other way similar or dissimilar to the foregoing, an advertisement, announcement, statement or representation of any kind to the public." Wis. Stat. § 100.18(1). "Public" can include just one person. *Kailin v. Armstrong*, 252 Wis.2d 676, 709, 643 N.W.2d 132 (Wis. App. 2002). The deciding factor as to whether the advertisement was provided to the public is whether the two parties have a particular relationship. *Id.*

18

By the plain meaning of the statute, Wis. Stat. § 100.18 is a false advertising statute. Viewing the facts in the light most favorable to defendants, the fraudulent representations made by Cousins were not contained in any sort of advertisement in any way similar to those listed in § 100.18. They were not made to the public as a whole. Rather, they were made on an individualized basis to Railing through emails, phone conversations, and face to face meetings where the parties already had established an ongoing relationship when Railing made contact with Cousins. Even if defendants were to point to Discovery Day as evidence of advertisement to the public, there are insufficient facts to demonstrate that this was open to the public rather than a particular class of people who had previously shown interest in opening a Cousins franchise. Defendants have failed to show how Cousins advertised similarly to the methods listed under § 100.18, or how Cousins advertised ownership of its franchises to the public. Therefore, defendants counterclaims pursuant to Wis. Stat. § 100.18 must be dismissed.

G.    Violations of Statutes governing Franchises

1.    Wisconsin Franchise Investment Law

The Wisconsin Franchise Investment Law provides in pertinent part that it shall "apply when a sale is made in this state or when an offer to sell is made or accepted in this state[.]" Wis. Stat. §553.59(1). Additionally, "[f]or the purpose of this section, an offer to sell is made in this state if the offer either originates in this state or is directed by the offeror to this state and received by the offeree in this state." Wis. Stat. §553.59(2).

19

Plaintiffs make a jurisdictional argument,[10] relying on *Maryland Staffing Services, Inc. v. Manpower, Inc.,* 936 F. Supp. 1494, 1507 (E.D. Wis.1996), to suggest that the court find that "WFIL [does] not apply to the out-of-state franchisee." (Pl. Br. at 23.) Plaintiffs, however, are wrong on the law; *Maryland Staffing* held that:

> the complaint *fails to allege that any facts* which would support an inference that the offer was received by Maryland Staffing in Wisconsin. Maryland Staffing was a Maryland franchise, not a Wisconsin franchise. Accordingly, the court concludes that Count 12 fails to state a claim upon which relief can be granted and therefore will be dismissed.

*Id.*, 936 F. Supp. at 1506 (emphasis added).

Reviewing the plain meaning of the statute, there are two ways that an offer to sell can be made: (1) an offer originates in Wisconsin; or (2) an offer is directed by the offeror to Wisconsin and the offer is received by the offeree in Wisconsin. Wis. Stat. §553.59(2). The statute applies when either of the following occurs: (1) a sale or an offer to sell occurs in Wisconsin; or (2) an offer to purchase is made and accepted in Wisconsin. Wis. Stat. §553.59(1).

Viewing the facts in the light most favorable to defendants, Cousins sent the final contract to Railing. This offer originated in Wisconsin, satisfying the § 553.59(2) requirement that an offer to sell originate in Wisconsin. This also satisfies the § 553.59(1) requirement that an offer to sell originate in Wisconsin. By the plain meaning of the statute, Cousins, a Wisconsin company, will be held to the legal standards of Wisconsin. Thus, summary judgment on this claim must be denied.

### 2. Indiana Franchise Disclosure Act

---

[10]Plaintiffs curiously maintain that under Wisconsin law the economic loss doctrine can apply to this case but that the WFIL cannot apply.

20

Indiana's Franchise Disclosure Act ("IFDA"), Ind. Code § 23-2-2.5-1 *et seq*, requires disclosure of various information. In pertinent part, § 27 provides:

> It is unlawful for any person in connection with the offer, sale or purchase of any franchise, ... directly or indirectly...(2) to make any untrue statements of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of circumstances under which they are made, not misleading; or (3) to engage in any act which operates or would operate as a fraud or deceit upon any person."

Ind. Code § 23-2-2.5-27. Fraud includes "any promise or representation or prediction as to the future not made honestly or in good faith." Ind. Code § 23-2-2.5-1(f).

Plaintiffs contend that defendants have not supported their fraud claims, they have not shown bad faith, and that the statutes of limitations has expired. In part, defendants argue that the IFDA is being used to counter plaintiffs' claims rather than assert a substantive claim, so the statute of limitations should not apply.

This analysis differs with the fraud analysis above in that the many promises of future performance are evidence in support of § 27(3). Not only do defendants' claims under the IFDA survive for the same reasons as the intentional fraud claims, the many promises are additional support to permit this claim to go to trial.

There were many different conversations by phone and by email with several different employees of Cousins. Among the many examples, there were different promises that Railing's stores would gross more than $400,000, which proved untrue. Additionally, Railing was provided false financial data of existing restaurants, and Morello advised that Railing use lower predictions of costs. With these examples of deceit that would lead to

21

poor restaurant performance, Cousins continued to negotiate with Railing. Viewing the facts in the light most favorable to defendants, this was negotiating in bad faith.

Finally, the statute of limitations had not expired prior to the filing of the complaint. The complaint was filed in March 2009. There are many possible dates that the court could use as the start of the statute of limitations. The Columbus restaurant opened in 2006, and was closed in October 2008. Railing points to his purported discovery that Morello was an employee of Cousins in 2008 as the time when the statute of limitations should begin. It was not until discovery that defendants learned of the false financial data.

Certainly, in the first year of operation, a restaurant may not be profitable for reasons other than the basis of these fraud claims. Additionally, because the future promises are a part of this claim, their discovery would begin the statute of limitations; the discovery of the false financial data is not conclusive.

Determining an exact date when defendants discovered the fraud is a vain endeavor on these facts. Obviously, when the Columbus location closed in 2008, it should have been quite clear to defendants that plaintiffs had made false promises about the annual profits from the restaurant. However, its not clear when defendants would have reasonably learned that such promises were made in bad faith.

It is possible that defendants discovered the fraud less than two years before the filing of the complaint.[11] Various fraudulent representations would have been discovered about the time of the Columbus restaurant's closing. The discovery of Morello as an employee of Cousins was one alleged fraud among many, and is not conclusive of the

---

[11] The court rejects defendants' argument that the statute of limitations does not matter because this is a defense to plaintiffs' claims; this is a counterclaim, and, thus, not a defense.

22

discovery of all of the fraud.  For example, defendants certainly knew that the promises of McCabe were false even if they did not know he acted in bad faith.  In the absence of a convincing argument and supportive facts from plaintiffs as to when the defendants should have discovered the alleged fraud, the court finds that the fraud was discovered when the Columbus restaurant closed in October 2008.   This is within the statute of limitations, as the complaint was filed in March 2009.

H. Violations of Theft Statutes

1. Wisconsin Statute § 943.20

The parties have advanced arguments on Wis. Stat. § 943.20 governing theft-by-fraud, relying on their fraud claims analyzed above, but neither address the law in detail. Because the intentional fraud claims must survive a motion to dismiss viewing the facts in the light most favorable to defendants, Wis. Stat. § 943.20 claim of defendants must also survive.

2. Indiana Code § 34-43-4-2

The Indiana Code provides compensation where property is converted.  Ind. Code § 34-43-4-2.  The parties, in their belief that this is an all-or-nothing dispute, in large part continue to rely on their previous arguments concerning fraud, and whether a contract is properly the subject of this act.  However, this argument is moot.

Defendants have not provided evidentiary support that any property was converted. While the two restaurants were open, there is no evidence that anyone other than defendants operated them.  The two restaurants have been closed, but there is still no indication that Cousins now operates that property, or any other property formerly owned by defendants. Certainly, Cousins has received money from defendants. However, money

23

is not property.[12]  Section 34-43-4-2 requires some sort of property – in the cases, usually real estate, but also any other tangible property – to be lost by defendants and controlled by plaintiffs.  If plaintiffs controlled either restaurant, or controlled other tangible property of the defendants, § 34-43-4-2 would apply.  However, the loss of money is sufficiently covered by the fraud claims, and the court declines to stretch the Indiana Code beyond recognition.[13]  Accordingly, defendants' counterclaim under Indiana Code § 34-43-4-2 must be dismissed.

I.      Rescission

In Wisconsin and Indiana, contracts may be rescinded if induced by fraudulent representations.  *Wickenhauser v. Lehtinen*, 734 N.W.2d 855 (Wis. 2007) (rescission of contract and restorative damages "are entirely consistent when fraud or misrepresentation is the cause of the claim); *A.J.'s Automotive Sales, Inc. v. Freet*, 725 N.E.2d 955, 967 (Ind. Ct. App. 2000) ("Fraud in the inducement of a contract is a proper basis for rescission").  However, parties seeking rescission must return anything earned through the contract within a reasonable amount of time.  *Schwabe v. Chantilly, Inc.*, 226 N.W.2d 452, 457 (Wis. 1975) (recognizing that a party to a contract cannot first elect to reap the benefits of a contract and then sue for rescission of that contract)*; American Cent. Life Ins. Co. v. Rosenstein*, 92 N.E. 380, 381 (Ind. Ct. App. 1910).

---

[12]The many cases this court has reviewed suggest this basic principle, including *Cornwell v. Gray Loon Outdoor Marketing Group, Inc.*, 906 N.E.2d 805 (Ind. 2009), *Romanowski v. Giordano Management Group, LLC*, 896 N.E.2d 558 (Ind. App. 2008), and *McLemore v. McLemore*, 827 N.E.2d 1135, (Ind. App. 2005).

[13]Without the conversion of property, the court does not find merit in plaintiffs' argument that the statute of limitations should apply. Plaintiffs' argument is moot.

24

Plaintiffs urge the court to find that the execution of the Scottsburg and Area Development Agreement contracts was an affirmation of the earlier Columbus contract, as was the failure of the defendants to take active steps to rescind the contracts following their discovery of alleged fraud. In plaintiffs' argument, it is implicit that the discovery of the fraud is believed to be the signing of the contracts.

Viewing the facts in the light most favorable to the defendants, the signing of the contracts was not the fraud; it was the event that the wrongdoers were attempting to induce by making fraudulent statements. As described above, the fraud was the false financial data.[14] This was not discovered until much later, following execution of the contract. At some point after his stores began to fail, Railing should have realized something was horribly wrong with his financial forecasts, and begun to consider what went wrong. During that time, he realized that Morello was not the independent franchisee that Railing thought him to be. But, in the light most favorable to defendants, this began to occur sometime around the time that his first restaurant began to fail. More likely, it began when Railing's second restaurant generated annual profits that were similarly below the breakeven markers of the first restaurant. Under this view of the facts, Railing did not affirm anything; it just took time for the fraud to be discovered. Therefore, plaintiffs motion for summary judgment on this counterclaim must be denied.

J.      Dismissal of William Specht Claims

By failing to respond to arguments, defendants have waived their counterclaims against Specht except for their Indiana Code §23-2-2.5-29 IFDA claim. The IFDA provides

_____

[14]The court does not include the IFDA misrepresentations under this analysis, but only the false financial data.

in pertinent part: "Every person who materially aids or abets in an act or transaction constituting a violation of this chapter is also liable jointly and severally to the same extent as the person whom he aided and abetted." Ind. Code § 23-2-2.5-29.

Plaintiffs maintain that Specht never made any representations to defendants, and that defendants have not shown why officers of Cousins should be personally liable in this case. Defendants submit: (1) that the court should rule on a motion to reopen discovery prior to ruling on this issue, and (2) that Specht made several representations to defendants. Defendants' request to reopen discovery to take the deposition of James Campbell was denied on December 3, 2010. (Doc. 84.)

Defendants rely on one alleged omission of Specht to show aiding and abetting; when Railing informed him that Railing was working with Morello, Specht did not identify Morello as an area developer for Cousins. (Def. PFOF ¶¶ 153-155.) It is not clear from defendants argument, or from the proposed findings of fact why Specht should have gotten the impression that Railing misunderstood Morello's role with Cousins.[15] Also, it is not clear why defendants believe Specht should have known to correct Railing during this phone conversation, other than the simple fact that Specht was the CEO of a company (and the inference that CEOs should know everything about their companies).

Even viewing the facts in the light most favorable to defendants, there is no evidence to show that Specht violated 23-2-2.5-29 other than, in his role as president, he should know everything. If defendants cannot provide facts to support claims against

---

[15]Defendants have clearly identified that Morello gave Railing a business card that did not list Cousins. It is clear where the fraud originated. What's not clear here is how Specht should have known that Morello gave Railing the wrong business card, other than from his role as president of Cousins.

26

Specht other than in his role as CEO of an entity, then the entity is the proper party. Therefore, the claims against Specht will be dismissed.

PLAINTIFFS' MOTION TO STRIKE JURY DEMAND

Lastly, plaintiffs submit that the jury demand in defendants' answer and counterclaims must be struck because they are contractually waived. In Indiana and Wisconsin, contracts are interpreted according to their plain meaning. *Pinkowski v. Calumet Twp. of Lake County, Ind.*, 852 N.E.2d 971, 981 (Ind. Ct. App. 2006); *Danbeck v. Am. Family Ins. Co.*, 629 N.W.2d 150, 154 (Wis. 2001). Moreover, jury waiver clauses are enforceable. *IFC Credit Corp. v. United Bus. & Indust. Fed. Credit Union*, 512 F.3d 989, 995 (7th Cir. 2008).[16]

In the very similar case of *IFC Credit Corp,* the Seventh Circuit applied law governing forum-selection clauses to a jury waiver in a contract. *Id.* at 992. The lower court had held a jury waiver invalid because (1) it was not the subject of negotiation, (2) it did not stand out, and (3) it was not reviewed by the waiving party's lawyer. *Id.* at 992. The Seventh Circuit rejected these arguments. *Id.* It dismissed the suggestion that jury waivers are unconstitutional inasmuch as Fed. R. Civ. P. 38 allows for waiver. *Id.* at 994. Moreover, the Seventh Circuit applied *Carnival Cruise lines* to admit boilerplate. The Seventh Circuit held that, where parties understand that they are making a contractual commitment, the jury waiver clause is binding. *Id.* at 995. Finally, the holding of *IFC Corp.* implicitly rejects a finding that jury waivers are unconscionable.

---

[16]Defendants try to use case law from the 1980s to overcome this 2008 case. The court does not find the argument convincing.

The plain meaning of these three contracts waives the right to a trial by jury. The clauses were not induced by fraud; the parties knew they were signing a contract, and the contracts contained statements in bold, capital letters revealing that they were signing away rights. That the clauses were standard form or boilerplate is inconsequential under *IFC Credit Corp.* Railing, as an attorney, had particular experience and knowledge respecting the need to read the entire contract, including boilerplate. Defendants knew or should have known what they were signing. While some pieces of the contract may fail under the pressure of intentional fraud, there was nothing fraudulent about signing the jury waiver. Accordingly, the motion to strike defendants' jury demand must be granted. Now, therefore,

IT IS ORDERED that plaintiff's motion for summary judgment on the complaint is denied.

IT IS FURTHER ORDERED that plaintiff and counterclaim defendants' motion for summary judgment on the counterclaims is granted in part and denied in part.

IT IS FURTHER ORDERED that plaintiff and counterclaim defendants' motion to strike defendants' jury demand is granted.

IT IS FURTHER ORDERED that a telephonic status conference is scheduled for November 23, 3011, at 9:30 a.m. The court will initiate the call.

Dated at Milwaukee, Wisconsin, this 30th day of September, 2011.


BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
CHIEF U. S. DISTRICT JUDGE

28